# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

S.D. Fla. Case No.

THOMAS PAYNE, ANDREA ACOSTA, KRYSTINA BONILLA, ALEXIA BOUCLIER, YONI BREVE, DANNY BUSTAMANTE, BRIAN CHAIKEN, SAMUEL CHOC, EDUARDO CONSUEGRA, RYAN CRESPO, GRISSELL DENIZARD, MARLENE MARTINEZ, ARMANDO PAZ, JR., GILBERTO PEREZ, ALEXANDER PEREZ, JOSE PORTILLO, ALEJANDRO RAMIREZ, NOE RIVERON, JUAN ZAMORA, MICHAEL HINES, BERNADETTE POLANSKY, individually and on behalf of all others similarly situated,

**JURY TRIAL DEMANDED**

        Plaintiffs,

    v.

ZF FRIEDRICHSHAFEN AG, ZF TRW AUTOMOTIVE HOLDINGS CORP., TRW AUTOMOTIVE INC., TRW AUTOMOTIVE U.S. LLC, TRW VEHICLE SAFETY SYSTEMS INC., HONDA MOTOR CO., LTD., AMERICAN HONDA MOTOR CO., INC., HONDA OF AMERICA MFG. INC., HONDA R&D CO., LTD., HYUNDAI MOTOR GROUP, HYUNDAI MOTOR CO., HYUNDAI MOTOR AMERICA, KIA MOTORS CORP., KIA MOTORS AMERICA, TOYOTA MOTOR CORP., TOYOTA MOTOR SALES, U.S.A., INC., and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,

        Defendants.

# CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

NATURE OF CLAIMS ...................................................................................................1

JURISDICTION AND VENUE .....................................................................................5

THE PARTIES ...............................................................................................................6

I.     TRW Defendants ...............................................................................................6

II.    Automaker Defendants ......................................................................................8

III.   Plaintiffs ...........................................................................................................11

GENERAL FACTUAL ALLEGATIONS ....................................................................19

I.     Definitions.........................................................................................................19

II.    TRW ACUs Have a Common, Uniform Defect ..............................................21

      A.     Defendants' Knowledge of the Defect ................................................21

III.   The Automaker Defendants Sold Their Vehicles As "Safe" and "Reliable" ..................30

IV.   The Automaker Defendants' Failure to Issue Recalls, Issuance of Late and Inadequate Recalls, and Failure to Assist Impacted Consumers ........................................................32

      A.     Failure to Provide Replacement Vehicles ...........................................33

TOLLING OF THE STATUTE OF LIMITATIONS ....................................................33

I.     Fraudulent Concealment ...................................................................................33

II.    Estoppel .............................................................................................................34

III.   Discovery Rule...................................................................................................34

CLASS ACTION ALLEGATIONS ..............................................................................35

I.     The Consumer Classes.......................................................................................35

II.    Numerosity and Ascertainability ......................................................................36

## TABLE OF CONTENTS
### (continued)

Page

III.    Predominance of Common Issues .................................................................. 36

IV.    Typicality ...................................................................................................... 38

V.    Adequate Representation .............................................................................. 38

VI.    Superiority .................................................................................................... 39

REALLEGATION AND INCORPORATION BY REFERENCE .............................................. 40

CLAIMS FOR RELIEF ............................................................................................. 40

I.    Nationwide Claims ...................................................................................... 40

    A.    Federal Claims Against the Automaker Defendants ...................... 40

        1.    Violation of the Magnuson-Moss Warranty Act,
            15 U.S.C. § 2301 *et seq.* ............................................... 40

    B.    Common Law and State Law Claims Against TRW ....................... 44

        2.    Fraudulent Concealment .................................................. 44

    C.    Common Law and State Law Claims Against Honda ..................... 46

        3.    Fraudulent Concealment .................................................. 46

        4.    Unjust Enrichment .......................................................... 49

    D.    Common Law and State Law Claims Against Hyundai .................. 50

        5.    Fraudulent Concealment .................................................. 50

        6.    Unjust Enrichment .......................................................... 52

    E.    Common Law and State Law Claims Against Toyota ..................... 53

        7.    Fraudulent Concealment .................................................. 53

        8.    Unjust Enrichment .......................................................... 56

**TABLE OF CONTENTS**
**(continued)**

Page

II.  State Consumer Sub-Class Claims........................................................................56

    A.  Claims Brought on Behalf of the Florida Consumer Sub-Class ...........56

        9.  Violation of the Florida Deceptive and Unfair Trade Practice Act, Fla. Stat. § 501.201, *et seq.* ...............................................................56

    B.  Claims Brought on Behalf of the South Carolina Consumer Sub-Class ..............61

        10.  Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* ...............................................61

        11.  Violation of the South Carolina Regulations of Manufacturers, Distributors, and Dealers Act, S.C. Code Ann. § 56-15-10, *et seq.*............65

        12.  Breach of the Implied Warranty of Merchantability, S.C. Code § 36-2-314.................................................................................67

    C.  Claims Brought on Behalf of the Virginia Consumer Sub Class...........68

        13.  Violation of the Virginia Consumer Protective Act, Va. Code Ann. § 59.1-196, *et seq.* ...............................................................68

        14.  Breach of the Implied Warranty of Merchantability, Va. Code Ann. § 8.2-314.................................................................................72

PRAYER FOR RELIEF ...............................................................................................73

DEMAND FOR JURY TRIAL ....................................................................................74

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1.      The things meant to protect us should protect us, not harm or kill us.  This is particularly true of cars because they are a tool millions of people use every day.  People trust that their cars are designed and built to keep them safe; and they expect that automakers (also known as "original equipment manufacturers" or "OEMs") take every reasonable step to make sure that nothing in their cars endangers their lives or those of any passengers who ride in them.

2.      This action concerns defective airbag control units ("ACUs") designed and manufactured by ZF Friedrichshafen AG, ZF TRW Automotive Holdings Corp., and its related entities ("TRW"), which are installed in certain Honda, Acura, Hyundai, Kia, Mitsubishi, Fiat Chrysler, and Toyota vehicles. Because of their defective design, TRW's ACUs are unreasonably susceptible to damage or electrical overstress conditions, which prevent the vehicles' airbags from deploying and the seatbelt pretensioners from engaging during a collision, thereby failing to protect vehicle occupants in a crash. The above automakers manufactured, sold, and leased vehicles containing TRW's defective ACUs—concealing the defect and knowingly misrepresenting their vehicles as safe to consumers and the public.

3.      Airbags and seatbelt pretensioners are critical safety features of any motor vehicle. Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield. In the milliseconds following a crash, the ACU is supposed to detect the crash and send a signal to the airbag inflator to ignite the airbag propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand or deploy in order to protect the vehicle occupant from serious injury or death.

4.      Likewise, seatbelt pretensioners are crucial safety features in any motor vehicle and work in tandem with seatbelts. Seatbelts restrain the strongest parts of an occupant's body, spreading out any force from the collision, helping the occupant's body to slow down, protecting an occupant's brain and spinal cord, and preventing the occupant from striking hard objects in the

crash.  A seatbelt's pretensioner is a component of the seatbelt system that locks the seatbelt in place during a crash. When the vehicle's ACU detects a crash, it sends a signal to the seatbelt pretensioner to initiate a concealed piston that proceeds to drive the spool that wraps and controls the seatbelt fabric. This retraction removes slack from the seatbelt, pulling the vehicle occupant's body firmly into his seat, and milliseconds later, releasing the occupant in a timely manner to receive the maximum protection benefit of the airbag.

5.      The application-specific integrated circuit ("ASIC") is the electronic component within the ACU that monitors signals from crash sensors.  When it fails, it can prevent airbag deployment and seatbelt pretensioners engagement or otherwise affect the proper operation of the ACU.  The ACU is located in the passenger compartment, and electrical wiring connects the ASIC to sensors located at the front of the vehicle.

6.      All TRW ACUs at issue in this litigation share a common, uniform design defect: the ACU's defective design makes the ASIC unreasonably susceptible to damage or electrical overstress ("EOS"), which in turn prevents the ACU from properly communicating with the airbags and seatbelt pretensioners during collisions (the "ACU Defect").  According to NHTSA's investigation, the ASIC is designed without sufficient electrical circuitry protection to allow electrical signals to enter the ACU via sensor wiring and thereby cause an EOS.  The ACU Defect can also result in the ACU's inability to be read with an Event Data Recorder ("EDR").

7.      Because of this common, uniform ACU Defect, TRW ACUs often fail to perform as they should.  Instead of deploying safety devices such as airbags and seatbelt pretensioners that protect vehicle occupants from bodily injury during accidents, the defective TRW ACUs too often fail to send a signal to deploy airbags and engage seatbelt pretensioners, causing occupants to suffer serious bodily injury and death.  As of April 2019, TRW's Defective ACUs have been responsible for at least 4 deaths and 6 serious injuries, worldwide.

8.      Automakers that purchased TRW's Defective ACUs were involved in their design and testing and knew or should have known of the ACUs' common, uniform design defect.

9.      Apart from the notice and warnings they received through their interactions with TRW, internal review, design approval, and testing, Honda, Hyundai, and Toyota (the named "Automaker Defendants" in this action) gained knowledge of the ACU Defect through various customer complaints and incidents of non-deployment.  For example, TRW and Hyundai knew, discussed, and investigated non-deployment incidents as early as August 2011.

10.     The Automaker Defendants also had knowledge that TRW's ACUs were experiencing the same problems in other automakers' or OEMs' vehicles.  Indeed, no later than January 2016, TRW reached out to the Automaker Defendants regarding the nature of the ACU Defect.

11.     TRW and its OEM customers received word of startling airbag failures in the field no later than July 28, 2013, when a TRW airbag failed to deploy in a 2012 Kia Forte, in San Leandro, CA. Another airbag non-deployment incident took place on December 27, 2013 involving a 2011 Hyundai Sonata in Myrtle, MS, and on March 13, 2016 there was yet another field non-deployment event involving a 2011 Hyundai Sonata in Omaha, NE. In each of these incidents, the ACU Defect led to a fatality.

12.     Fiat Chrysler then issued a public recall of the Defective ACUs in the United States in September 2016, putting all OEMs, including the Automaker Defendants, on further notice of the defect.

13.     Despite Fiat Chrysler's initial recall and their independent concerns about the ACU Defect, Defendants utterly failed to take reasonable, let alone sufficient measures to investigate the defect or protect purchasers, lessees, and the general public.

14.     As overwhelming evidence of the defect grew, Defendants did not issue recalls, warn consumers, or otherwise protect them from the risk, through, for example, systematic loaner vehicle programs. Indeed, it was not until 2018 that Kia and Hyundai finally issued limited recalls. And Honda and Toyota continue to refuse to recall its affected vehicles, despite knowing they contain the same deadly ACU Defect.

15.    The Automaker Defendants' failure and/or delay in issuing recalls and providing replacement parts is consequential—it exposes purchasers, lessees, drivers, passengers, and, indeed, the general public, to an ongoing and unnecessary risk of harm.

16.    Plaintiffs and consumers are in the frightening position of having to drive dangerous vehicles for many months and possibly years while they wait for Defendants to recall and replace the Defective ACUs in their cars. Plaintiffs are effectively left without safe vehicles to take them to and from work, pick up their children from schools or daycares, or, in the most urgent of situations, transport themselves or others to hospitals.

17.    TRW and the Automaker Defendants knew, and certainly should have known, that the TRW ACUs installed in millions of its vehicles were defective.  By concealing their knowledge of the nature and extent of the ACU Defect from the public, while continuing to advertise their products as safe and reliable, Defendants demonstrated a blatant disregard for public welfare and safety. Moreover, Defendants violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

18.    As a result of this misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages.  Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Purchasers and lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the ACU Defect been disclosed.  Plaintiffs and the Classes were deprived of a safe, defect-free ACU installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they simultaneously avoided incurring the costs associated with recalls and installing replacement parts for many years.

19.    Plaintiffs and the Classes also will likely suffer damages in the form of out-of-pocket and loss-of-use expenses and costs, including, but not limited to, expenses and costs

associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care. Also, as a direct result of misconduct by Defendants, each Plaintiff and Class member will likely incur out-of-pocket economic damage by virtue of their incurring the expense of taking the time to eventually bring their cars in for repairs, once all Automaker Defendants issue recalls.

20.     Plaintiffs and the Classes also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of their vehicles with defective TRW ACUs. Defendants' false representations and omissions concerning the safety and reliability of those vehicles and their concealment of the known safety defects plaguing their vehicles and brands, caused certain Plaintiffs and Class members to purchase or retain vehicles of diminished value.

**JURISDICTION AND VENUE**

21.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' Magnusson-Moss claims arise under federal law. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because they conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in

solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

23.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2), because they are subject to personal jurisdiction in this District. Also, venue is proper in this District pursuant to 28 U.S.C. § 1407.

## THE PARTIES

### I.       TRW Defendants

24.     Defendant ZF Friedrichshafen AG ("ZF TRW") is a foreign for-profit corporation with its principal place of business in Friedrichshafen, Baden-Wurttemberg, Germany.  ZF TRW is a worldwide supplier of driveline and chassis technology for cars and commercial vehicles, including active and passive safety technology.   ZF TRW, either directly or through its wholly-owned subsidiaries, manufactures airbag control units for distribution in the United States and ultimate use in Florida, including the airbag control units at issue in this litigation.  ZF TRW delivers its products, including the airbag control units at issue in this litigation, into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

25.     ZF TRW Automotive Holdings Corp. ("TRW Automotive Holdings") is a subsidiary of ZF TRW with its principal place of business in Livonia, Michigan.  TRW Automotive Holdings is an American supplier of automotive systems, modules, and components to automotive OEMs, including the Automaker Defendants.   TRW Automotive Holdings sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the ACUs in this litigation.  TRW Automotive Holdings delivers its products into the stream of commerce with

the expectation that they will be purchased by consumers in the United States and the State of Florida.

26.     TRW Automotive Inc. ("TRW Automotive") is a subsidiary of ZF TRW with its principal place of business in Livonia, Michigan.  TRW Automotive is an American supplier of automotive systems, modules, and components to automotive OEMs, including the Automaker Defendants.  TRW Automotive sells, designs, manufactures, tests, markets, and distributes airbag control units in the United States.  TRW Automotive manufactures ACUs in the United States, including ACUs at issue in this litigation.  TRW Automotive delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

27.     TRW Automotive U.S. LLC ("TRW Automotive U.S.") is a subsidiary of TRW Automotive with its principal place of business in Livonia, Michigan.  TRW Automotive U.S. is an American supplier of automotive systems, modules, and components to automotive OEMs, including the Automaker Defendants.  TRW Automotive U.S. sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the ACUs at issue in this litigation.  TRW Automotive U.S. delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

28.     TRW Vehicle Safety Systems Inc. ("TRW Vehicle Safety Systems") is a subsidiary of TRW Automotive Holdings with its principal place of business in Farmington Hills, Michigan.  TRW Vehicle Safety Systems is an American supplier of automotive systems, modules, and components to automotive OEMs, including the Automaker Defendants.  TRW Vehicle Safety Systems sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the ACUs at issue in this litigation.  TRW Vehicle Safety Systems delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

29.     Defendants ZF TRW, TRW Automotive Holdings, TRW Automotive, TRW Automotive U.S., and TRW Vehicle Safety Systems are collectively referred to as "TRW" or the

"TRW Defendants." TRW is the manufacturer of all the Defective ACUs that are the subject of this Complaint.

## II.    Automaker Defendants

30.    Defendant Honda Motor Co., Ltd. ("Honda Motor") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Honda Motor manufactures and sells motorcycles, automobiles, and power products through independent retail dealers, outlets, and authorized dealerships primarily in Japan, North America, Europe, and Asia.

31.    Defendant American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor headquartered in Torrance, California. American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, sport utility vehicles, and automobile parts in the United States. American Honda manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana; East Liberty, Ohio; Lincoln, Alabama; and Marysville, Ohio.

32.    Defendant Honda of America Mfg. Inc. ("Honda Mfg.") is an Ohio corporation with its principal place of business in Marysville, Ohio. Honda Mfg. is a subsidiary of Honda Motor. Honda Mfg. is involved in the design, manufacture, testing, marketing, distribution and sale of Honda vehicles in the United States, including those utilizing the Defective ACUs.

31.    Defendant Honda R&D Co. Ltd. ("Honda R&D") is a Japanese corporation with its principal place of business in Wako, Japan. Honda R&D is a subsidiary of Honda Motor. Honda R&D is involved in the design, development, manufacture, assembly, testing, distribution and sale of Honda vehicles, including those utilizing the Defective ACUs.

32.    Defendants Honda Motor, Honda Mfg., Honda R&D, and American Honda are collectively referred to as "Honda" or the "Honda Defendants." Honda vehicles sold in the United States contain Defective ACUs manufactured by the TRW Defendants. The Honda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

33.     Defendant Hyundai Motor Group ("Hyundai Group") is a foreign for-profit corporation with its principal place of business in Seoul, South Korea.   Hyundai Group manufacturers automobiles, steel, and automotive parts.

34.     Defendant Hyundai Motor Company ("Hyundai Motor") is a subsidiary of Hyundai Group and is headquartered in Seoul, South Korea.   Hyundai Motor manufactures and sells automobiles through independent retail dealers, outlets, and authorized dealerships primarily in North America, South America, Asia, Europe, Africa, and Oceania.

35.     Defendant Hyundai Motor America ("Hyundai America") is a subsidiary of Hyundai Motor headquartered in Fountain Valley, California.  Hyundai America conducts the sale, marketing, and operational activities for Hyundai cars, trucks, sport utility vehicles, and automobile parts in the United States. Hyundai America manufactures and assembles its vehicles for sale in the United States in an automobile plant located in Montgomery, Alabama.

36.     Defendant Kia Motors Corporation ("Kia Motors") is a subsidiary of Hyundai Motor and is headquartered in Seoul, South Korea. Kia Motors manufactures and sells automobiles through independent retail dealers, outlets, and authorized dealerships primarily in America, Europe, Mexico, and India.

37.     Defendant Kia Motors America ("Kia America") is a subsidiary of Kia Motors headquartered in Irvine, California.  Kia America conducts the sale, marketing, and operational activities for Hyundai cars, trucks, sport utility vehicles, and automobile parts in the United States. Kia America manufactures and assembles its vehicles for sale in the United States in an automobile plant located in West Point, Georgia.

38.     As used in this Complaint, "Kia" and "Kia Defendants" refers to Kia Motors and Kia America.  "Hyundai" and "Hyundai Defendants" refers to Hyundai Motor Group, Hyundai Motor, Hyundai America, Kia Motors, and Kia America.  Hyundai vehicles sold in the United States contain Defective ACUs manufactured by the TRW Defendants.  The Hyundai Defendants

deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of Florida.

39.     The Hyundai Defendants engineered, designed, developed, manufactured, or installed the Defective ACUs in the Hyundai and Kia branded Class vehicles (defined below), and approved the Defective ACUs for use in those vehicles.  They also developed, reviewed, and approved the marketing and advertising campaigns designed to sell those Class Vehicles.

40.     Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States.  Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

41.     Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota.  Toyota U.S.A. is headquartered in Torrance, California and is a subsidiary of Toyota.

42.     Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Erlanger, Kentucky with major operations in Arizona, California, and Michigan. TEMA is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada.  TEMA is a subsidiary of Toyota.

43.     Defendants Toyota, Toyota U.S.A., and TEMA are collectively referred to as "Toyota" or the "Toyota Defendants."  Toyota vehicles sold in the United States contain Defective ACUs manufactured by the TRW Defendants.  The Toyota Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

### III.   Plaintiffs

33.     Unless otherwise indicated, all Plaintiffs identified below purchased their Class Vehicles primarily for personal, family, and household use. Plaintiffs and the proposed Classes were harmed and suffered actual damages. The defective TRW ACUs significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and/or equipped with TRW ACUs and the widespread publicity of the ACU Defect.

34.     Further, Plaintiffs and the proposed Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented and did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Plaintiffs and the Classes, either through a higher purchase price or higher lease payments, paid more than they would have had the ACU Defect been disclosed. Plaintiffs and the Classes were deprived of having safe, defect-free ACUs installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

35.     Plaintiffs and the proposed Classes will also suffer damages in the form of out-of-pocket and loss-of-use expenses and costs, including, but not limited to, expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

36.     Members of the proposed Classes, who will have to bring their vehicles to dealerships, will also suffer out-of-pocket economic damage by virtue of their incurring the expense of taking the time to bring their car in for repairs.

37.     The defective TRW ACUs create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiffs and the proposed Classes.

Andrea Acosta—Florida

38.    Plaintiff Andrea Acosta resides in Hollywood, Florida.  Plaintiff Acosta purchased a new 2015 Toyota Corolla on July 17, 2015 for approximately $18,040.56 from South Dade Toyota in Homestead, Florida.   The value of her 2015 Toyota Corolla has been diminished as a result of the ACU Defect.  Plaintiff Acosta would not have purchased the 2015 Toyota Corolla or would not have paid as much for it had she known of the problems or risk associated with the vehicle's ACU Defect.

Krystina Bonilla—Florida

39.    Plaintiff Krystina Bonilla resides in Miami, Florida.  Plaintiff Bonilla purchased a used 2016 Toyota Corolla on October 14, 2017 for approximately $16,452.75 from Oscar Motors in Miami, Florida.  The value of her 2016 Toyota Corolla has been diminished as a result of the ACU Defect.  Plaintiff Bonilla would not have purchased the 2016 Toyota Corolla or would not have paid as much for it had she known of the problems or risk associated with the vehicle's ACU Defect.

Alexia Bouclier—Florida

40.    Plaintiff Alexia Bouclier resides in Miami Beach, Florida.  Plaintiff Bouclier leased a new 2017 Honda Civic on September 17, 2017 for approximately $270 per month from Braman Honda in Miami, Florida.  The value of her 2017 Honda Civic has been diminished as a result of the ACU Defect.  Plaintiff Bouclier would not have purchased the 2017 Honda Civic or would not have paid as much for it had she known of the problems or risk associated with the vehicle's ACU Defect.

Yoni Breve—Florida

41.     Plaintiff Yoni Breve resides in Miami, Florida.  Plaintiff Breve purchased a new 2017 Toyota Corolla in September 2017 for approximately $17,000 from West Kendall Toyota in Miami, Florida.  The value of his 2017 Toyota Corolla has been diminished as a result of the ACU Defect.  Plaintiff Breve would not have purchased the 2017 Toyota Corolla or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Danny Bustamante—Florida

42.     Plaintiff Danny Bustamante resides in Miramar, Florida.  Plaintiff Bustamante purchased a new 2015 Kia Optima in January 2015 from Miami Lakes Automall in Miami Lakes, Florida.  The value of his 2015 Kia Optima has been diminished as a result of the ACU Defect.  Plaintiff Bustamante would not have purchased the 2015 Kia Optima or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Brian Chaiken—Florida

43.     Plaintiff Brian Chaiken resides in Palmetto Bay, Florida.  Plaintiff Chaiken owns a 2013 Honda CRV, which was purchased used on March 15, 2015 for approximately $35,000 from Braman Honda in Miami, FL.  The value of his 2013 Honda CRV has been diminished as a result of the ACU Defect.  Plaintiff Chaiken would not have purchased the 2013 Honda CRV or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Samuel Choc—Florida

44.     Plaintiff Samuel Choc resides in Miami, Florida.  Plaintiff Choc purchased a new 2013 Toyota Tacoma Pre-Runner on October 18, 2012 for approximately $24,000 from South Dade Toyota in Homestead, Florida.  The value of his 2013 Toyota Tacoma Pre-Runner has been

diminished as a result of the ACU Defect.  Plaintiff Choc would not have purchased the 2013 Toyota Tacoma Pre-Runner or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Eduardo Consuegra—Florida

45.     Plaintiff Eduardo Consuegra resides in Coral Gables, Florida.  Plaintiff Consuegra leased a new 2016 Kia Optima on April 21, 2016 for approximately $20,000 from Braman Kia in Miami, Florida.  The value of his 2016 Kia Optima has been diminished as a result of the ACU Defect.  Plaintiff Consuegra would not have leased the 2016 Kia Optima or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Ryan Crespo—Florida

46.     Plaintiff Ryan Crespo resides in Miami, Florida.  Plaintiff Crespo leased a new 2016 Toyota Corolla for $274 a month, with a $300 down payment.  The lease began in September 2016 and was originated at West Kendall Toyota in Miami, Florida.  The value of his 2016 Toyota Corolla has been diminished as a result of the ACU Defect.  Plaintiff Crespo would not have leased the 2016 Toyota Corolla or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Grissell Denizard—Florida

47.     Plaintiff Grissell Denizard resides in Coral Gables, Florida.  Denizard owns a 2013 Honda Accord, which was purchased used in 2015 for approximately $17,000 from Brickell Honda in Miami, FL.  The value of her 2013 Honda Accord has been diminished as a result of the ACU Defect.  Plaintiff Denizard would not have purchased the 2013 Honda Accord or would not have paid as much for it had she known of the problems or risk associated with the vehicle's ACU Defect.

<u>Michael Hines—South Carolina</u>

48.     Plaintiff Michael Hines resides in Gainesville, Florida.  Plaintiff Hines owns a 2012 Toyota Tundra, which was purchased used in October 2013 for approximately $28,000 from Scenic Chevrolet in Walhalla, South Carolina.  The value of his 2012 Toyota Tundra has been diminished as a result of the ACU Defect.  Plaintiff Hines would not have purchased the 2012 Toyota Tundra or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

<u>Marlene Martinez—Florida</u>

49.     Plaintiff Marlene Martinez resides in Miami, Florida.  Plaintiff Martinez owns a 2017 Toyota Tacoma, which was purchased on June 17, 2017 for approximately $15,000 from West Kendall Toyota in Miami, Florida.  The value of her 2017 Toyota Tacoma has been diminished as a result of the ACU Defect.  Plaintiff Martinez would not have purchased the 2017 Toyota Tacoma or would not have paid as much for it had she known of the problems or risk associated with the vehicle's ACU Defect.

<u>Thomas Payne—Florida</u>

50.     Plaintiff Thomas Payne resides in Miami, Florida.  Plaintiff Payne owns a 2014 Honda Civic, which was purchased used on August 3, 2017 for approximately $10,799 from Offlease of Miami in Miami, FL.  The value of his 2014 Honda Civic has been diminished as a result of the ACU Defect.  Plaintiff Payne would not have purchased the 2014 Honda Civic or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Armando Paz, Jr.—Florida

51.     Plaintiff Armando Paz, Jr. resides in Pinecrest, Florida.  Plaintiff Paz purchased or leased a new 2016 Toyota Tacoma in December 2016 for approximately $36,000 from Headquarter Toyota in Hialeah, Florida.  The value of his 2016 Toyota Tacoma has been diminished as a result of the ACU Defect.  Plaintiff Paz would not have leased the 2016 Toyota Tacoma or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Gilberto Perez—Florida

52.     Plaintiff Gilberto Perez resides in Miami, Florida.  Plaintiff Perez owns a 2013 Kia Optima, which was purchased used in September 2017 for approximately $15,000 from Kendall Toyota in Miami, Florida.  The value of his 2013 Kia Optima has been diminished as a result of the ACU Defect.  Plaintiff Perez would not have purchased the 2013 Kia Optima or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Alexander Perez—Florida

53.     Plaintiff Alexander Perez resides in Doral, Florida.  Plaintiff Perez leased a new 2015 Kia Optima for $415 per month.  The lease began in August 2015 and was originated at Braman Kia in Miami, Florida.  The value of his 2015 Kia Optima has been diminished as a result of the ACU Defect.  Plaintiff Perez would not have leased the 2015 Kia Optima or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Bernadette Polansky—Virginia

54.     Plaintiff Bernadette Polansky resides in Virginia Beach, Virginia.  Plaintiff Polansky owns a 2015 Toyota Corolla, which was purchased used in June 2018 for approximately

$14,000 from CarMax in Virginia Beach, Virginia.  The value of her 2015 Toyota Corolla has been diminished as a result of the ACU Defect.  Plaintiff Polansky would not have purchased the 2015 Toyota Corolla or would not have paid as much for it had she known of the problems or risk associated with the vehicle's ACU Defect.

Jose Portillo—Florida

55.     Plaintiff Jose Portillo resides in Miami, Florida.  Plaintiff Portillo purchased a new 2018 Toyota Tacoma in January 2018 for approximately $33,000 from West Kendall Toyota in Miami, Florida.  The value of his 2018 Toyota Tacoma has been diminished as a result of the ACU Defect.  Plaintiff Portillo would not have purchased the 2018 Toyota Tacoma or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Alejandro Ramirez—Florida

56.     Plaintiff Alejandro Ramirez resides in Miami, Florida.  Plaintiff Ramirez owns a 2015 Acura TLX, which was purchased used on March 14, 2018 for approximately $20,000 from Time Car One in Hialeah, FL.  The value of his 2015 Acura TLX has been diminished as a result of the ACU Defect.  Plaintiff Ramirez would not have purchased the 2015 Acura TLX or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Noe Riveron—Florida

57.     Plaintiff Noe Riveron resides in Miami, Florida.  Plaintiff Riveron owns a 2013 Toyota Corolla, which was purchased used on June 20, 2016 for approximately $13,900 from Ford of Kendall in Miami, Florida.  The value of his 2013 Toyota Corolla has been diminished as a result of the ACU Defect.  Plaintiff Riveron would not have purchased the 2013 Toyota Corolla

or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Juan Zamora—Florida

58.     Plaintiff Juan Zamora resides in Miami, Florida.  Plaintiff Zamora owns a 2016 Kia Optima, which was purchased used on January 12, 2019 for approximately $9,800 in Miami, FL. The value of his 2016 Kia Optima has been diminished as a result of the ACU Defect.  Plaintiff Zamora would not have purchased the 2016 Kia Optima or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

59.     For ease of reference, the following chart organizes the Plaintiffs by the state in which they acquired their respective Class Vehicles:

| No. | State | Class Representative Plaintiff | Vehicle |
|---|---|---|---|
| 1 | Florida | Andrea Acosta | Toyota Corolla (2015) |
| 2 | Florida | Krystina Bonilla | Toyota Corolla (2016) |
| 3 | Florida | Alexia Bouclier | Honda Civic (2017) |
| 4 | Florida | Yoni Breve | Toyota Corolla (2017) |
| 5 | Florida | Danny Bustamante | Kia Optima (2015) |
| 6 | Florida | Brian Chaiken | Honda CRV (2013) |
| 7 | Florida | Samuel Choc | Toyota Tacoma Pre-Runner (2013) |
| 8 | Florida | Eduardo Consuegra | Kia Optima (2016) |
| 9 | Florida | Ryan Crespo | Toyota Corolla (2016) |
| 10 | Florida | Grissell Denizard | Honda Accord (2013) |
| 11 | Florida | Marlene Martinez | Toyota Tacoma (2017) |
| 12 | Florida | Thomas Payne | Honda Civic (2014) |
| 13 | Florida | Armando Paz, Jr. | Toyota Tacoma (2016) |
| 14 | Florida | Gilberto Perez | Kia Optima (2013) |
| 15 | Florida | Alexander Perez | Kia Optima (2015) |
| 16 | Florida | Jose Portillo | Toyota Tacoma (2018) |
| 17 | Florida | Alejandro Ramirez | Acura TLX (2015) |
| 18 | Florida | Noe Riveron | Toyota Corolla (2013) |
| 19 | Florida | Juan Zamora | Kia Optima (2016) |
| 20 | South Carolina | Michael Hines | Toyota Tundra (2012) |
| 21 | Virginia | Bernadette Polansky | Toyota Corolla (2015) |

## GENERAL FACTUAL ALLEGATIONS

### I.    Definitions

60.    Plaintiffs bring this action on behalf of themselves, and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually, and on behalf of those similarly situated, for economic losses stemming from Defendants' manufacture, sale or lease, and false representations or omissions concerning the Defective ACUs in the Class Vehicles, including, but not limited to, diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties and injunctive relief/equitable relief.

61.    "Class Vehicles" refers to all vehicles in the United States that have Defective ACUs (defined below) that were manufactured, sold, or leased by Defendants.

62.    "Defective ACUs" refers to all ACUs manufactured by TRW ("TRW ACUs") that contain the ACU Defect, including (a) all ACUs subject to recall or currently under investigation by NHTSA, identified in the table in paragraph 64 below; and (b) all TRW ACUs in Defendants' vehicles subject to any subsequent expansion of pre-existing recalls or new recalls announced prior to the date of an order granting class certification, relating to the tendency of such ACUs to fail and prevent the deployment of airbags and engagement of seatbelt pretensioners.

63.    All Defective ACUs contain the ACU Defect. As a result of the ACU Defect, Defective ACUs have an unreasonably dangerous tendency to fail to deploy airbags and engage seatbelt pretensioners.

64.    The following table identifies, to the best of Plaintiffs' understanding, and without the benefit of discovery, the vehicles manufactured by Defendants that contain the ACU Defect ("Class Vehicles"):

| Automaker | Make | Model | Model Years |
|-----------|------|-------|-------------|
| Hyundai | Hyundai | Sonata | 2011-2013 |
| Hyundai | Hyundai | Sonata Hybrid | 2011-2012 |
| Honda | Acura | RLX | 2014-2019 |

| Automaker | Make | Model | Model Years |
|---|---|---|---|
| Honda | Acura | RLX Hybrid | 2014-2019 |
| Honda | Acura | TL | 2012-2014 |
| Honda | Acura | TLX | 2015-2017 |
| Honda | Acura | TSX | 2012-2014 |
| Honda | Acura | TSX Sport Wagon | 2014 |
| Honda | Acura | TSX Sport Wagon | 2012-2014 |
| Honda | Honda | Accord | 2013-2015 |
| Honda | Honda | Accord Hybrid | 2014-2015 |
| Honda | Honda | Civic | 2012-2015 |
| Honda | Honda | Civic GX | 2012-2015 |
| Honda | Honda | Civic Hybrid | 2012-2015 |
| Honda | Honda | Civic SI | 2012-2015 |
| Honda | Honda | CR-V | 2012-2016 |
| Honda | Honda | Fit | 2012-2017 |
| Honda | Honda | Fit EV | 2013-2014 |
| Honda | Honda | Ridgeline | 2012-2014 |
| Hyundai | Hyundai | Sonata | 2013-2019 |
| Hyundai | Hyundai | Sonata Hybrid | 2013-2019 |
| Kia | Kia | Sedona | 2011-2012 |
| Kia | Kia | Optima Hybrid | 2011-2012 |
| Kia | Kia | Optima | 2011-2013 |
| Kia | Kia | Forte | 2010-2013 |
| Kia | Kia | Forte Koup | 2010-2013 |
| Kia | Kia | Optima | 2013-2019 |
| Kia | Kia | Optima Hybrid | 2012-2016 |
| Kia | Kia | Sedona | 2014 |
| Toyota | Toyota | Avalon | 2012-2018 |
| Toyota | Toyota | Avalon Hybrid | 2013-2018 |
| Toyota | Toyota | Corolla | 2011-2019 |
| Toyota | Toyota | Corolla IM | 2017-2018 |
| Toyota | Toyota | Corolla Matrix | 2011-2013 |
| Toyota | Toyota | Sequoia | 2012-2017 |
| Toyota | Toyota | Tacoma | 2012-2019 |
| Toyota | Toyota | Tundra | 2012-2017 |

## II.    TRW ACUs Have a Common, Uniform Defect

65.    The part at issue in this matter is the ACU, which contains the ASIC, an electronic component within the ACU that monitors signals from crash sensors.  The ACU is located in the vehicle's passenger compartment, and it connects the ASIC, via electrical wiring, to sensors located at the front of the vehicle.  The ASIC monitors signals from crash sensors located in the vehicle.

66.    In the milliseconds following a collision, the ACU is supposed to detect the collision and signal the safety devices to deploy and/or engage.  For example, the ACU causes the airbag inflator to ignite the airbag propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand or deploy, to protect the vehicle occupant from serious injury or death.  Simultaneously, the ACU causes the seatbelt pretensioner to deploy or engage, removing slack from the occupant's seatbelt, pulling the occupant's body firmly into his seat, and milliseconds later, releasing the occupant in a timely manner to receive the maximum protection benefit of the airbag.

67.    The ACU incorporates electrical circuitry, such as diodes, to protect the ASIC from harmful electrical signals that could disrupt or damage its performance.   A failure of the ASIC prevents deployment of the required airbags and safety devices, or it may otherwise affect the proper operation of the ACU such as by not allowing the ACU to be read with the vehicle's EDR. This failure of the ACU subjects the vehicle occupant to significant injury and even death.

### A.    Defendants' Knowledge of the Defect

68.    Since no later than 2011, there have been countless non-deployment incidents caused by the Defective ACUs.  Yet despite involvement in investigations and knowledge of the ACU Defect, the Defendants have refused to recall vehicles containing the ACU Defect and/or have improperly narrowed the scope of the affected vehicles in order to save costs and avoid negative publicity.

69.     TRW and Hyundai, for example, had knowledge of the ACU Defect at least as early as August 2011, when Hyundai requested that TRW analyze the ACU from a Kia Forte in China involved in an event in which the airbags did not deploy.  TRW observed damage on the ASIC that was consistent with EOS.

70.     From that point on, Hyundai and TRW were inundated with a string of non-deployment incidents.  In February 2012, for example, Hyundai was notified of another collision involving a 2011 Hyundai Sonata airbag non-deployment incident.  Then in March 2012, TRW communicated with Hyundai regarding its analysis of an ACU from a Kia Forte in Egypt involved in an event in which the airbags did not deploy, wherein TRW observed damage on the ASIC that was consistent with EOS.

71.     Again, in May 2012, TRW communicated with Hyundai about the investigation of field events with observed EOS.  And in June 2012, Hyundai inspected a vehicle involved in a non-deployment incident and found no crash event recorded on the EDR.  Hyundai requested TRW's assistance into the investigation.  Despite these various incidents, neither TRW nor Hyundai implemented any recalls.

72.     In March 2014, Hyundai received a lawsuit complaint involving an incident of non-deployment of airbags in a 2012 Kia Forte, which was reported to NHTSA through an Early Warning Report.  NHTSA subsequently sent Hyundai an inquiry regarding the non-deployment incident, to which Hyundai responded.  From March to June 2015, Hyundai attempted to download data from the ACU of the 2012 Kia Forte that was the basis of the March 2014 lawsuit, but was unable to communicate with the ACU.  Hyundai requested assistance from TRW, who was also unable to obtain any data.  During this time, Hyundai referred the issue to TRW, which concluded that non-deployment occurred.  Hyundai, however, still refused to issue recalls.

73.     In the meantime, Hyundai and TRW continued to investigate other non-deployment incidents.  In February 2015, at Hyundai's request, TRW downloaded available data from an ACU installed in a Hyundai Sonata involved in an event in which the airbags did not deploy.  In May 2015, Hyundai was notified of a collision involving another incident of airbag non-deployment in

a 2011 Hyundai Sonata, and TRW downloaded available data from an ACU installed a Kia Forte involved in an event in which the airbags did not deploy.

74.    In the summer of 2015, TRW advised Hyundai that NHTSA was investigating airbag non-deployment incidents affecting a wide range of vehicle models containing TRW ACUs. Then again in October 2015, Hyundai inspected a vehicle and found that the vehicle's ACU was non-communicative.  Despite the above and Hyundai's and TRW's independent knowledge of the ACU Defect, Hyundai and TRW continued to conceal the defect from the public and failed to issue any recalls.

75.    According to information filed with NHTSA, in January 2016, TRW communicated with the Automaker Defendants regarding the EOS effect on the ACU.  Then on February 2016, TRW met with NHTSA, at TRW's request, to discuss its investigation of EOS observed on its ACUs and incidents involving non-deployment of airbags.  Also that same day, TRW advised Hyundai that TRW had provided information regarding all manufacturers with the Defective ACUs to NHTSA.

76.    Between July and November 2016, Hyundai received two additional reports of collisions involving 2011 Hyundai Sonata vehicles in which similar incidents of airbag non-deployment occurred.  Hyundai did not inform consumers or issue a recall.

77.    Upon information and belief, in August 2016, TRW disclosed to the Automaker Defendants that Fiat Chrysler had decided to recall certain models containing TRW ACUs. A month later, in September 2016, TRW communicated again with each of the Automaker Defendants about its ongoing investigation of the ACU Defect and its investigation with NHTSA. None of the Automaker Defendants issued a recall or informed the public and its consumers of the defect.

78.    On September 13, 2016, Chrysler filed its first Part 573 Safety Recall Report for vehicles that could experience a loss of airbag and seatbelt pretensioner deployment capability due to damage to the ASU's ASIC.  This recall affected approximately 1.5 million Chrysler vehicles. Despite the significant number of recalled vehicles, the Automaker Defendants continued to resist implementing their own recalls or informing the general public of the ACU Defect.

79.     Around 2017 another regulatory body became involved in the ACU Defect investigation—Transport Canada. Transport Canada requested information from Hyundai and TRW regarding a non-deployment event incident in a 2013 Kia Forte Koup in Canada following a crash which resulted in the vehicle's destruction.  In August 2017, TRW and Hyundai conducted a joint inspection at a TRW facility of the ACU of the 2013 Forte Koup that had been flagged by TC.  The inspection identified internal damage to the ASIC and that no EDR data was recorded.

80.     During September through October 2017, Hyundai received and responded to an inquiry from NHTSA regarding the non-deployment of the 2013 Forte Koup incident in Canada. In November 2017, NHTSA's Office of Defects Investigation ("ODI") contacted Hyundai to obtain follow-up information in connection with one of the four vehicles under investigation.

81.     In December 2017, faced with the seriousness of the ACU Defect, Hyundai finally engaged a third-party engineering firm to study and analyze the facts and circumstances surrounding its investigation and reassessment. Hyundai, however, never informed the public or issued a recall.

82.     It was not until February 21, 2018, that Hyundai and TRW finally conceded that the circumstances associated with the ACU Defect bore similarities to those related to recall campaign 16V-668, where EOS appeared to be a root cause of airbag non-deployment in significant frontal crashes in certain Fiat Chrysler vehicles.  TRW asserted that EOS on the ACU could be caused by negative transients originating from certain vehicle components and could be prevented by additional circuit protection installed in ACUs.

83.     Finally, on February 27, 2018, Hyundai issued a limited safety recall on model year 2011 Hyundai Sonata vehicles, effectively conceding that the ACU Defect manifesting itself in its vehicles bore enough similarities to the Chrysler recall issued nearly two years earlier.  Despite the use of the Defective ACUs in other non-recalled Hyundai vehicles and despite the number of non-deployment incidents in its other non-recalled vehicles since as early as 2011, Hyundai resisted recalling its Kia Forte or other vehicles.  Indeed, the first Hyundai recall was improperly narrow, covering only half a million Hyundai Sonata vehicles.

84.     Hyundai's first recall continued to put TRW and the Automaker Defendants on notice of the ACU Defect.  In March 2018, TRW communicated with the other Automaker Defendants regarding the ACU Defect and the status of its investigation. Honda and Toyota, however, refused to issue any recalls, despite TRW's communications, prior recalls involving the Defective ACUs, and their own knowledge of non-deployment incidents reported by their customers.

85.     On March 9, 2018, Hyundai tentatively concluded that the root cause of the ACU Defect was likely to involve a component/equipment issue.  This conclusion was based on its finding as to the relative susceptibility of the subject ACU to EOS due to the lack of Schottky diodes, a feature included in subsequent ACU versions provided by TRW starting with model year 2013 and later Hyundai Sonata and Sonata Hybrid vehicles.

86.     On March 16, 2018, NHTSA announced its Preliminary Evaluation of certain Hyundai vehicle make and models following reports of air bag non-deployment in frontal crashes (identified as PE18-003).  Although initially focused on certain Hyundai vehicles, NHTSA identified TRW as the supplier of the Defective ACUs, thereby putting the other Automaker Defendants on notice that their vehicles contained the same Defective ACUs NHTSA was investigating. At this point, each of the Automaker Defendants certainly knew or should have known that their vehicles with TRW ACUs contained a defect.

87.     On April 18, 2018, Hyundai was finally forced to expand its safety recall scope to include all model year Sonata and Sonata Hybrid vehicles equipped with ACUs that did not contain Schottky diode circuit protection.  As of that time, Hyundai was aware of at least four field incidents in the U.S. market and one incident in the Canadian market involving the ACU Defect.  EOS was observed inside the ACUs involved in three of these crashes.

88.     In May 2018, TRW continued to communicate with the Automaker Defendants about the ongoing ACU Defect investigation.

89.     On May 28, 2018, Hyundai finally agreed to recall 2010-2013 Kia Forte and Forte Koup vehicles based on NHTSA's conclusion that the ACUs did not contain adequate circuit

protection and created a higher risk of EOS.  Based on its engineering analysis of other Kia models equipped with the same TRW ACU as the Forte and Forte Koup, a recall of the 2011-2013 Optima, 2011-2012 Optima Hybrid, and 2011-2012 Sedona was issued on June 1, 2018.

90.      On April 19, 2019, NHTSA upgraded its investigation of the ACU Defect involving TRW ACUs from a PE to an Engineering Analysis, in order to "expand the scope of the investigation to include [TRW], the Tier-one supplier and any manufacturers who installed this unit in production vehicles."  NHTSA's upgrade to an Engineering Analysis only further confirmed what the Automaker Defendants knew or should have known as to the severity of the ACU Defect and widespread scope of their affected vehicles.

91.      Notably, NHTSA's Engineering Analysis also disclosed that ODI had recently identified two substantial front crash events involving airbag non-deployments in MY 2018 and MY 2019 Toyota Corollas.  NHTSA found that, following the collisions, the ACUs could not be read with an EDR, similar to the condition found in other incidents involving non-deployment of airbags in other OEMs' vehicles caused by EOS.  NHTSA further concluded EOS was the likely cause of the non-deployments in the Toyota incidents.  One of these crash events resulted in a fatality.

92.      As discussed above, the Automaker Defendants shared knowledge of the ACU Defect not only by their knowledge of each of the recalls issued by Chrysler and Hyundai and TRW's communications advising them of NHTSA's investigation into the ACU Defect, but also because of several customer complaints involving the ACU Defect in their own vehicles.

93.      Honda, for example, was or should have been aware of several customer complaints submitted via NHTSA that should have alerted it to the ACU Defect. In March 2013, a customer complained to NHTSA that in a severe vehicle crash where both the front and the side of the vehicle sustained damage, the airbags in his 2012 Acura TSX did not deploy, and his wife died in the crash. The dealership explained to him that the airbags were "ok," but could not explain why they did not deploy.

94.     A Honda customer in November 2014 also reported to NHTSA that her husband fell asleep while driving a 2013 Honda Accord, proceeded to hit a tree and a mailbox, and then drove into a ditch head on, completely destroying the vehicle. But the airbags for some mysterious reason did not deploy.

95.     Another Honda customer, in April 2015, reported that she was involved in a serious accident with her 2013 Honda Accord where she hit another vehicle, but the airbags did not deploy. Instead, when she opened the door of her vehicle to get out of the car, the airbags deployed, hitting the right side of her face and her neck, shoulder, and breast. The Honda dealer informed her it was an issue with the sensor.

96.     In May 2015, a Honda customer reported to NHTSA that she was involved in a head on collision with her 2013 Honda Accord where the airbag light came on, but the airbag did not deploy. She suffered injuries in the crash that required surgery. She was informed that the sensors and seatbelt structure needed to be replaced.

97.     In February of 2016, NHTSA received another complaint from a 2015 Honda Accord driver who was involved in an accident where the vehicle was deemed a total loss, but the airbags failed to deploy and the driver sustained a head injury.

98.     In October of 2016, a Honda dealer informed NHTSA that a Honda customer driving a 2013 Honda Accord hit a deer while driving 45 miles per hour, but the airbags on the driver's side failed to deploy. The vehicle was totaled.

99.     In September of 2018, NHTSA received a complaint about a 2015 Honda Accord that was involved in an accident where the vehicle was traveling 50 miles per hour and "CRASHED INTO A FIRE TRUCK. ALL OF THE AIR BAGS DEPLOYED [sic] WITH FORCE EXCEPT THE FRONT PASSENGER SIDE AIR BAG. THE DRIVER SUSTAINED SEVEN FRACTURES IN THE WRISTS, AND ALSO A NECK INJURY. MEDICAL TREATMENT WAS REQUIRED." "THE MANUFACTURER WAS NOTIFIED."

100.    Despite its communications with TRW, its knowledge of the Fiat Chrysler and Hyundai recalls related to the same Defective ACU in its own vehicles, and numerous customer

- 27 -

complaints about the ACU Defect, Honda concealed the ACU Defect from its customers, NHTSA, and the public. To date, Honda has refused to issue a recall or admit its vehicles contain the same, uniform ACU Defect.

101.    Toyota was similarly aware or should have been aware of several customer complaints regarding the ACU Defect in Toyota vehicles that were submitted to NHTSA. For example, in May 2013, NHTSA received a customer complaint about an accident involving a 2011 Toyota Corolla. The vehicle was involved in a serious traffic accident where the car was totaled, but the airbags did not deploy. The driver sustained serious injuries requiring multiple surgeries, after being launched from the driver's seat. The insurance adjuster informed the customer to contact Toyota to inquire about the airbags not deploying.

102.    In September of 2014, NHTSA received a complaint about a 2011 Toyota Corolla that was totaled but none of the airbags deployed even though the impact occurred at about 40 miles per hour.

103.    In April of 2014, NHTSA also received a complaint about an accident involving a 2011 Toyota Corolla, where the entire front end was crushed and the part of the vehicle under the steering wheel was pushed in towards the driver seat. None of the airbags in the vehicle deployed, and, as a result, the driver hit her head against the windshield, cracking the windshield. The driver also sustained chest contusions from the impact against the steering wheel. The customer contacted Toyota directly about the airbag's failure to deploy, but, according to the customer, Toyota called her "a liar." The customer requested the information from the EDR to be downloaded and read, but Toyota never responded to her request.

104.    NHTSA also received a complaint in January of 2015 that a 2013 Toyota Avalon rammed into a pole, but the airbags failed to deploy. "THE MANUFACTURER WAS MADE AWARE OF THE FAILURE."

105.    In March of 2016, NHTSA was also informed that a 2014 Toyota Avalon Hybrid was involved in a front-end collision, in which the car was totaled, and the driver sustained injuries to the head, ribs, and shoulder, because the airbags failed to deploy.

106.    NHTSA was also informed in March of 2016 about another accident involving a 2011 Toyota Corolla that suffered an impact between 50 to 60 miles per hour. The entire front of the car was damaged, the bumper completely torn off, and the engine forced back from the frame of the vehicle. Nevertheless, none of the airbags deployed. Even though the driver was wearing his seatbelt, he hit is head near the windshield and sustained significant whiplash from the impact. The customer complained: "WE CANNOT BELIEVE THAT THE AIRBAGS WERE [not] DEPLOYED FROM AN IMPACT LIKE THIS. WE CHECKED AND THERE ARE NO RECALLS REGARDING AIRBAGS FOR THIS CAR. SOMETHING IS NOT RIGHT. THEY SHOULD HAVE GONE OFF AND PROTECTED MY HUSBAND DURING THIS COLLISION."

107.    In August of 2016, it was also reported to NHTSA that the driver of a 2014 Toyota Avalon was involved in a crash wherein the vehicle was traveling approximately 50 miles per hour, but the airbags failed to deploy. "THE MANUFACTURER WAS NOTIFIED OF THE FAILURE."

108.    In April of 2018, NHTSA was informed of another accident involving a 2014 Toyota Avalon Hybrid where the car was hit at 65 miles per hour, rolled over, and then was rammed into a rail. None of the airbags, however, deployed, and the driver of the vehicle suffered a head injury with a laceration and mild brain trauma.

109.    Despite its communications with TRW, its knowledge of the Fiat Chrysler and Hyundai recalls related to the same Defective ACU contained in its own vehicles, and numerous customer complaints about the ACU Defect, Toyota concealed the ACU Defect from its customers,

NHTSA, and the public. To date, Toyota has refused to issue a recall or admit its vehicles contain the same, uniform ACU Defect.

### III.  The Automaker Defendants Sold Their Vehicles As "Safe" and "Reliable"

110.     At all relevant times, in advertisements and promotional materials, the Automaker Defendants continuously maintained that their vehicles were safe and reliable, while uniformly omitting any reference to the ACU Defect. Plaintiffs, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements and omissions about Class Vehicles' safety in the Automaker Defendants' advertisements and promotional materials were material to decisions to purchase or lease Class Vehicles.

111.     Examples of Honda's safety and reliability representations include the following:

a.     In 2015, Honda represented on its website that "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of other vehicles, and injury mitigation for pedestrians." "As a leader, Honda looks beyond government regulations, studying real world situations to develop new safety technologies for everyone."

b.     In 2015, Honda represented on its website: "Acura believes driving a luxury car should be a highly enjoyable experience. And while we tend to dwell on the more exhilarating aspects of our vehicles, we consider your safety a top priority . . . .  Safety has been top of mind with Acura engineers since day one . . . .  Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."

c.     In 2019, Honda represented on Acura's website that "Acura was the first luxury brand awarded top safety ratings across its entire model line.  ★★★★★ NHTSA 5-STAR OVERALL VEHICLE SCORE."

d.    In 2019, Honda also represented on Acura's website: "Our unrelenting mission to help keep you safe inspires technologies as innovative as they are effective. Protection is at the heart of Acura design. After all, an Acura can be replaced. Your family cannot."

112.    Examples of Hyundai's safety and reliability representations include the following:

a.    In 2017, Hyundai represented on its website: The Hyundai "SONATA [was] named a 2017 IIHS Top Safety Pick+."

b.    In 2019, Hyundai also represented on its website: "It's always been our aim to engineer the safest cars in the industry[.]"

c.    In 2019, Hyundai also represented on its website that "[y]ou can't overstate the importance of keeping the people you love safe, which is why we can't overstate the importance of always striving to make our safety features more advanced and innovative."

d.    Similarly, in 2019, Hyundai represented on Kia's website that "[a]t Kia, we work tirelessly to ensure that every passive safety system on our vehicles is designed to help you handle the unexpected. And that every active safety system is designed to help you avoid trouble whenever possible."

e.    Hyundai also represented on Kia's website in 2019 that Kia vehicles were: "Built with your safety as our top priority, Kia's vehicle lineup has collected numerous top safety awards."

f.    In 2019, Hyundai also represented on Kia's website that its ACU "system monitors the severity of the impact, the presence of a front passenger, and seat-belt use, and then controls airbag inflation accordingly whenever possible."

113.    Examples of Toyota's safety and reliability representations include the following:

a.    In 2015, Toyota represented on its website that "[f]or us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

b.      In 2018, Toyota represented on its website that the "2018 Toyota Corolla [i]s an IIHS [Top Safety Pick]."

c.      In 2019, Toyota represented in its brochure that "[s]afety is always in style. So we made it standard."

d.      In 2019, Toyota also represented in its brochure that "[a] driver and front passenger Advance Airbag System, driver and front passenger seat-mounted side airbags, front and rear side curtain airbags, and driver knee and front passenger seat-cushion airbags come standard on Corolla. It's all part of a system designed to help keep you safe."

114.    Contrary to these representations and countless others like them, the Automaker Defendants failed to equip the Class Vehicles with ACUs that would meet these standards and failed to disclose to consumers that their vehicles actually contained dangerous and Defective ACUs.

## IV.    **The Automaker Defendants' Failure to Issue Recalls, Issuance of Late and Inadequate Recalls, and Failure to Assist Impacted Consumers**

115.    For years Defendants have known about the ACU Defect and concealed the defect from the public, and refused to issue recalls.  There are currently 12.3 million vehicles that have not been recalled and are the subject of an ongoing NHTSA investigation into the ACU Defect.

116.    Indeed, of the Automaker Defendants, only Hyundai has issued recalls—much belated recalls, years after investigating the ACU Defect and conferring with TRW and NHTSA on the same.  But even Hyundai's two recalls have been woefully inadequate, as they exclude many other Hyundai vehicles with the ACU Defect, which are currently under investigation by NHTSA.

117.    Honda and Toyota, to date, have refused to issue any recalls of the ACU Defect, despite the rising number of ACU failures in its own vehicles, the Fiat Chrysler and Hyundai recalls, the NHTSA investigation, and its own communications with TRW about the ACU Defect.

118.    Given the large number of affected vehicles, when all the vehicles containing the ACU Defect are ultimately recalled, it will be unlikely that they will be repaired in the near term.

119.    As the executive director of the Center for Auto Safety ("CAS") explained, it could not be more apparent that "the auto industry thus far has learned very little from Takata"—the largest automotive recall in U.S. history, resulting in at least 24 deaths and countless more injuries—in light of the actions, or lack thereof, of Defendants in the face of yet another dangerous vehicle defect that has already claimed at least eight lives.  As CAS's director further explained: "While the first fatality reports [relating to the ACU Defect] emerged three years ago, it has taken a higher body count for more significant action to be taken by NHTSA and most impacted manufacturers remain silent.  The industry needs to do better," and most certainly needs to be held accountable.

### A.    Failure to Provide Replacement Vehicles

120.    The Class Vehicles are not safe to drive. Due to Defendants' failures, Plaintiffs and Class members are left with poor options—be without use of a vehicle; purchase, lease, or rent a new vehicle until Defendants complete and/or issue and complete a recall; or, use a vehicle with a dangerously Defective ACU over an extended period of time.

121.    As Senators Blumenthal and Markey explained in the Takata recalls related to defective airbags, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

122.    Yet, none of the Defendants, except Hyundai for the limited number of vehicles it has recalled, are providing loaner or replacement vehicles to Class members with Defective ACUs.

### TOLLING OF THE STATUTE OF LIMITATIONS

### I.    Fraudulent Concealment

123.    Upon information and belief, Defendants have known or should have known about the ACU Defect in their Defective ACUs since at least January 2016, when TRW informed the Automaker Defendants of the ACU Defect. Through no fault or lack of diligence, Plaintiffs and

members of the Classes were deceived regarding the Class Vehicles and could not reasonably discover the ACU Defect or Defendants' deception with respect to the ACU Defect.

124.    Defendants did not fully investigate or disclose the seriousness of the ACU Defect, but instead ignored and concealed the defect from consumers and the public and refused to initiate recalls to remedy the defect or issued belated, insufficient recalls.

125.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality, and grade of the Class Vehicles and to disclose the ACU Defect and corresponding safety risks.

126.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein.  Plaintiffs and members of the Classes reasonably relied on Defendants' knowing, active, and affirmative concealment.

127.    Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## II.    **Estoppel**

128.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles; and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations, and/or active concealment, of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

## III.    **Discovery Rule**

129.    The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective ACUs.

130.    Plaintiffs and Class members, however, had no realistic ability to discern that the vehicles were defective, until—at the earliest— their airbag(s) failed to deploy or they learned of

NHTSA's investigation into the ACU Defect. Even then, Plaintiffs and Class members would have had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect, and prior knowledge of it.

## CLASS ACTION ALLEGATIONS

131.     The Classes' claims all derive directly from a single course of conduct by Defendants. This case is about the responsibility of Defendants, at law and in equity, for their knowledge, conduct, and products. Defendants have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many—and for some claims, all—states share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rules of Civil Procedure 23(a); and (b)(3), and/or (b)(2), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## I.     The Consumer Classes

132.     The Plaintiffs bring this action and seek to certify and maintain it as a class action under Federal Rules of Civil Procedure 23(a); and (b)(2), and/or (b)(3), and/or (c)(4); on behalf of themselves and a Nationwide Consumer Class defined as follows:

> All persons in the United States who entered into a lease or bought a Class Vehicle, and who (i) still own or lease the Class Vehicle, as of April 24, 2019 or (ii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

133.    The Plaintiffs allege statewide class action claims on behalf of classes in the following states: Florida, South Carolina, and Virginia. Each of these State Consumer Classes is initially defined as follows:

> All persons who entered into a lease or bought a Class Vehicle in the state of ____ (*e.g.*, Florida), and who (i) still own or lease the Class Vehicle, as of April 24, 2019 or (ii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

## II.    Numerosity and Ascertainability

134.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide and thousands, if not more, Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

135.    Each of the Classes are ascertainable because their members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A), and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## III.    Predominance of Common Issues

136.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3), because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.    Whether the Class Vehicles suffer from the ACU Defect;

b.    Whether Defendants knew or should have known about the ACU Defect; and, if so, how long Defendants have known of the defect;

c.    Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.      Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

e.      Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

f.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

g.      Whether Defendants misrepresented that the Class Vehicles were safe;

h.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with the ACU Defect;

i.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.      Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

k.      Whether Defendants violated each of the States' consumer protection statutes; and, if so, what remedies are available under those statutes;

l.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

n.      Whether the Class Vehicles suffered a diminution of value because of the Defective ACUs;

o.      Whether Defendants have been unjustly enriched by their conduct;

p.      Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q.    Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the ACUs in the Class Vehicles are defective and/or not merchantable;

r.    Whether Defendants should be declared responsible for notifying all Class members of the ACU Defect, and ensuring that all vehicles with the ACU Defect are promptly recalled and repaired;

s.    What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants, and to vindicate statutory and public policy; and

t.    How such penalties should be most equitably distributed among Class members.

## IV.    **Typicality**

137.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3), because Plaintiffs' claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

## V.    **Adequate Representation**

138.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

139.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

## VI.    **Superiority**

140.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2), because Defendants have acted, and refused to act, on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

141.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

142.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation—by even a small fraction of the Class—would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

143.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

144.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and

reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

145.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the ACU Defect without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective ACUs implicate the Class Vehicles; constitute evidence supporting various claims, including diminution of value; and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls; and because of the installation of Defective ACUs as replacement airbags. The increased risk of injury from the ACU Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

## REALLEGATION AND INCORPORATION BY REFERENCE

146.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

I.    **Nationwide Claims**

A.    **Federal Claims Against the Automaker Defendants**

### COUNT 1

**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.***

147.    Plaintiffs bring this Count against the Automaker Defendants on behalf of members of the Nationwide Consumer Class.

148.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a)-(d).

149.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

150.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

151.    The Automaker Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

152.    Section 2310(d)(1) of the Magnuson-Moss Warranty Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

153.    The Automaker Defendants provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, the Automaker Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

154.    The Automaker Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class, pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective ACUs.

155.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

156.   Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between the Automaker Defendants, on the one hand, and Plaintiffs and the other Class members, on the other.

157.   Any limitations on the warranties are substantively unconscionable. The Automaker Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. The Automaker Defendants failed to disclose the ACU Defect to Plaintiffs and the other Class members. Thus, the Automaker Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

158.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either the Automaker Defendants or their agents (dealerships) to establish privity of contract.

159.   Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between the Automaker Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

160.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give the Automaker Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

161.   Furthermore, affording the Automaker Defendants an opportunity to cure their breach of written warranties would be unnecessary and futile here. At the time of the sale or lease of each Class Vehicle, the Automaker Defendants knew, should have known, or were reckless in not knowing of their misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be

inadequate, and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford the Automaker Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

162. Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because the Automaker Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

163. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorney's fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

164. Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have or will incur in attempting to rectify the ACU Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in getting their Class Vehicles repaired and/or going through the recall process.

165. The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for the Automaker Defendants' conduct presents common questions of law. Equity and fairness require the establishment by Court decree and

administration under Court supervision of a program funded by the Automaker Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

**B.      Common Law and State Law Claims Against TRW**

**COUNT 2**

**Fraudulent Concealment**

166.     Plaintiffs bring this claim against TRW on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

167.     As described above, TRW made material omissions and/or affirmative misrepresentations regarding the Defective ACUs contained in the Class Vehicles.

168.     TRW concealed and suppressed material facts regarding the Defective ACUs— most importantly, the ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belts, thereby failing to protect drivers and passengers in a collision.

169.     TRW still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect from Plaintiffs and the Class.

170.     TRW had a duty to disclose the ACU Defect because it:

a.      Had exclusive and/or far superior knowledge and access to the facts, and knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.      Intentionally concealed the foregoing from Plaintiffs and Class Members; and

c.      Made incomplete representations about the safety and reliability of the Defective ACUs and/or Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

171.    These omitted and concealed facts were material because they would be relied upon by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products are material concerns to a consumer.

172.    TRW concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely.

173.    TRW also misrepresented the safety and reliability of the Defective ACUs and/or Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

174.    TRW actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its ACU units, to protect its profits, and to avoid recalls that would hurt the brand's image and cost TRW money. It did so at the expense of Plaintiffs and the Class.

175.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

176.    Had they been aware of the Defective ACUs installed in the Class Vehicles, and TRW's disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles, or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of TRW's fraudulent concealment.

177.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of TRW's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by TRW's conduct.

178.    The value of all Class members' vehicles has diminished as a result of TRW's fraudulent concealment of the ACU Defect and has made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

179.    Accordingly, TRW is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the Defective ACUs.

180.    TRW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching TRW. TRW's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### C.    Common Law and State Law Claims Against Honda

### COUNT 3

### Fraudulent Concealment

181.    Plaintiffs bring this claim against Honda on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Honda under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

182.    As described above, Honda made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective ACUs contained therein.

183.    Honda concealed and suppressed material facts regarding the Defective ACUs—most importantly, the ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belt pretensioners, thereby failing to protect drivers and passengers in collisions.

184.    Honda still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect, in efforts to avoid a costly recall.

185.    Honda had a duty to disclose the ACU Defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts, and Honda knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing from Plaintiffs and Class Members; and

c.    Made incomplete representations about the safety and reliability of the Defective ACUs and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

186.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Honda not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety and to uphold its recall obligations under the Sale Agreement and governing laws.

187.    Honda concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely, as represented by Honda and reasonably expected by consumers.

188.    Honda also misrepresented the safety and reliability of the Defective ACUs and Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

189.    Honda actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Honda money. It did so at the expense of Plaintiffs and the Class.

190.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

191.    Had they been aware of the Defective ACUs installed in the Class Vehicles, and Honda's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Honda's fraudulent concealment.

192.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Honda's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by Honda's conduct.

193.    The value of all Class members' vehicles has diminished as a result of Honda's fraudulent concealment of the ACU Defect and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

194.    Accordingly, Honda is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining, or otherwise disposing of the Defective ACUs.

195.     Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Honda. Honda's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 4

### Unjust Enrichment

196.     Plaintiffs (excluding those who did not purchase a Class Vehicle from a Honda dealership) bring this claim against Honda on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

197.     Honda has received and retained a benefit from the Plaintiffs and inequity has resulted.

198.     Honda benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Class Vehicles were worth, to Plaintiffs, who overpaid for these Class Vehicles, and/or would not have purchased these Class Vehicles at all; and who have been forced to pay other costs.

199.     It is inequitable for Honda to retain these benefits.

200.     Plaintiffs do not have an adequate remedy at law.

201.     As a result of Honda's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**D.** **Common Law and State Law Claims Against Hyundai**

**COUNT 5**

**Fraudulent Concealment**

202.    Plaintiffs bring this claim against Hyundai on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Hyundai under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

203.    As described above, Hyundai made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective ACUs contained therein.

204.    Hyundai concealed and suppressed material facts regarding the Defective ACUs— most importantly, the ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belt pretensioners, thereby failing to protect drivers and passengers in collisions.

205.    Hyundai still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect.

206.    Hyundai had a duty to disclose the ACU Defect because it:

a.      Had exclusive and/or far superior knowledge and access to the facts, and Hyundai knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.      Intentionally concealed the foregoing from Plaintiffs and Class Members; and

c.      Made incomplete representations about the safety and reliability of the Defective ACUs and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

207.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class.

Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Hyundai not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety and to uphold its recall obligations under the Sale Agreement and governing laws.

208.    Hyundai concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely, as represented by Hyundai and reasonably expected by consumers.

209.    Hyundai also misrepresented the safety and reliability of the Defective ACUs and Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

210.    Hyundai actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Hyundai money. It did so at the expense of Plaintiffs and the Class.

211.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

212.    Had they been aware of the Defective ACUs installed in the Class Vehicles, and Hyundai's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Hyundai's fraudulent concealment.

213.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Hyundai's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by Hyundai's conduct.

214.    The value of all Class members' vehicles has diminished as a result of Hyundai's fraudulent concealment of the ACU Defect and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

215.    Accordingly, Hyundai is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining, or otherwise disposing of the Defective ACUs.

216.    Hyundai's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Hyundai. Hyundai's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 6

### Unjust Enrichment

217.    Plaintiffs (excluding those who did not purchase a Class Vehicle from a Hyundai dealership) bring this claim against Hyundai on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

218.    Hyundai has received and retained a benefit from the Plaintiffs and inequity has resulted.

219.     Hyundai benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

220.     It is inequitable for Hyundai to retain these benefits.

221.     Plaintiffs do not have an adequate remedy at law.

222.     As a result of Hyundai's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

### E.     Common Law and State Law Claims Against Toyota

### COUNT 7

### Fraudulent Concealment

223.     Plaintiffs bring this claim against Toyota on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Toyota under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

224.     As described above, Toyota made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective ACUs contained therein.

225.     Toyota concealed and suppressed material facts regarding the Defective ACUs— most importantly, the ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belt pretensioners, thereby failing to protect drivers and passengers in collisions.

226.     Toyota still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect.

227.     Toyota had a duty to disclose the ACU Defect because it:

a.      Had exclusive and/or far superior knowledge and access to the facts, and Toyota knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.      Intentionally concealed the foregoing from Plaintiffs and Class Members; and

c.      Made incomplete representations about the safety and reliability of the Defective ACUs and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

228.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Toyota not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety and to uphold its recall obligations under the Sale Agreement and governing laws.

229.    Toyota concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely, as represented by Toyota and reasonably expected by consumers.

230.    Toyota also misrepresented the safety and reliability of the Defective ACUs and Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

231.    Toyota actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Toyota money. It did so at the expense of Plaintiffs and the Class.

232.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

233.    Had they been aware of the Defective ACUs installed in the Class Vehicles and Toyota's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Toyota's fraudulent concealment.

234.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Toyota's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by Toyota's conduct.

235.    The value of all Class members' vehicles has diminished as a result of Toyota's fraudulent concealment of the ACU Defect and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

236.    Accordingly, Toyota is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining, or otherwise disposing of the Defective ACUs.

237.    Toyota's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Toyota. Toyota's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 8

### Unjust Enrichment

238.     Plaintiffs (excluding those who did not purchase a Class Vehicle from a Toyota dealership) bring this claim against Toyota on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

239.     Toyota has received and retained a benefit from the Plaintiffs and inequity has resulted.

240.     Toyota benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

241.     It is inequitable for Toyota to retain these benefits.

242.     Plaintiffs do not have an adequate remedy at law.

243.     As a result of Toyota's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## II.     State Consumer Sub-Class Claims

### A.     Claims Brought on Behalf of the Florida Consumer Sub-Class

### COUNT 9

### Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*

244.     This claim is brought only on behalf of the Florida Consumer Sub-Class against TRW, Honda, Hyundai, and Toyota.

245.     Plaintiffs and the Florida Consumer Sub-Class are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

246.     Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

247.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

248.     In the course of TRW's, Honda's, Hyundai's, and Toyota's business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

249.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective ACUs installed in them.

250.     As alleged above, TRW knew or should have known of the ACU Defect no later than January 2016, through its design and development of the ACU, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself and the automakers, internal investigations into airbag non-deployment incidents, ACU and ASIC government investigations, and public recalls.

251.     As alleged above, Hyundai knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls. Toyota also knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls.  And Honda

knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls.

252.   By failing to disclose and by actively concealing the ACU Defect in the Class Vehicles and/or the Defective ACUs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective ACUs to fail to deploy vehicle safety systems, including airbags and seatbelt pretensioners, in a collision event.

253.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious ACU Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective ACUs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

254.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Florida Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective ACUs installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

255.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective ACUs installed in them with an intent to mislead Plaintiffs and the Florida Consumer Sub-Class.

256.   Defendants knew or should have known that their conduct violated the FDUTPA.

257.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the ACU Defect or their failure to reasonably investigate it.

258.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

259.    Defendants owed Plaintiffs and the Florida Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them because Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Florida Consumer Sub-Class; and/or

    c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Florida Consumer Sub-Class that contradicted these representations.

260.    Because Defendants fraudulently concealed the ACU Defect in Class Vehicles and/or the Defective ACUs installed in them, resulting in a raft of negative publicity once the ACU Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

261.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective ACUs in Class Vehicles were material to Plaintiffs and the Florida Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

262.   Plaintiffs and the Florida Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the ACU Defect that existed in the Class Vehicles and/or the Defective ACUs installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Florida Consumer Sub-Class either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Florida Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

263.   Plaintiffs and the Florida Consumer Sub-Class risk irreparable injury as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiffs, the Florida Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

264.   As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs and the Florida Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

265.   Plaintiffs and the Florida Consumer Sub-Class are entitled to recover their actual damages under Florida Statute § 501.211(2), and attorneys' fees under Florida Statute § 501.2105(1).

266.   Plaintiffs and the Florida Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**B.      Claims Brought on Behalf of the South Carolina Consumer Sub-Class**

**COUNT 10**

**Violation of the South Carolina Unfair Trade Practices Act**

**S.C. Code Ann. § 39-5-10, *et seq.***

267.    This claim is brought only on behalf of the South Carolina Consumer Sub-Class against TRW and Toyota.

268.    TRW and Toyota are "persons" under S.C. Code Ann. § 39-5-10.  The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a).  TRW and Toyota engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them.  TRW's and Toyota's actions as set forth below and above occurred in the conduct of trade or commerce.

269.    In the course of TRW's and Toyota's businesses, TRW and Toyota failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  TRW and Toyota also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective ACUs installed in them

270.    As alleged above, TRW knew or should have known of the ACU Defect no later than January 2016, through its design and development of the ACU, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself and the automakers, internal investigations into airbag non-deployment incidents, ACU and ASIC government investigations, and public recalls.

271.     As alleged above, Hyundai knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls. Toyota also knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls.  And Honda knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls.

272.     TRW and Toyota failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them.

273.     By failing to disclose and by actively concealing the ACU Defect in the Class Vehicles and/or the Defective ACUs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, TRW and Toyota engaged in unfair or deceptive business practices in violation of the South Carolina UTPA. TRW and Toyota deliberately withheld the information about the propensity of the Defective ACUs in the Class Vehicles to fail to communicate with airbags and seatbelt pretensioners in collision events.

274.     In the course of TRW's and Toyota's businesses, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defects discussed above. TRW and Toyota compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective ACUs installed in them were safe, reliable, and of high quality and by claiming to be reputable manufacturers that value safety.

275.    TRW's and Toyota's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective ACUs installed in them, the quality of TRW's and Toyota's brands, and the true value of the Class Vehicles.

276.    TRW and Toyota intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective ACUs installed in them with an intent to mislead Plaintiffs and the South Carolina Consumer Sub-Class.

277.    TRW and Toyota knew or should have known that their conduct violated the South Carolina UTPA.

278.    As alleged above, TRW and Toyota made material statements about the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them that were either false or misleading.  TRW's and Toyota's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the ACU Defect or their failure to reasonably investigate it.

279.    To protect their profits and to avoid remediation costs and a public relations nightmare, TRW and Toyota concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and continue driving highly dangerous vehicles.

280.    TRW and Toyota owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them because TRW and Toyota:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

281.    Because TRW and Toyota fraudulently concealed the ACU Defect in Class Vehicles and/or the Defective ACUs installed in them, resulting in a raft of negative publicity once the ACU Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by TRW's and Toyota's conduct, they are now worth significantly less than they otherwise would be.

282.    TRW's and Toyota's failure to disclose and active concealment of the dangers and risks posed by the Defective ACUs in Class Vehicles were material to Plaintiffs and the South Carolina Consumer Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

283.    Plaintiffs and the South Carolina Consumer Sub-Class suffered ascertainable loss caused by TRW's and Toyota's misrepresentations and their failure to disclose material information.  Had they been aware of the ACU Defect that existed in the Class Vehicles and TRW's and Toyota's complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of TRW's and Toyota's misconduct.

284.    TRW's and Toyota's violations present a continuing risk to Plaintiffs, the South Carolina Consumer Sub-Class, as well as to the general public.  TRW's and Toyota's unlawful acts and practices complained of herein affect the public interest.

285.    As a direct and proximate result of TRW's and Toyota's violations of the South Carolina UTPA, Plaintiffs and the South Carolina Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

286.     Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seek monetary relief against TRW and Toyota to recover for their economic losses.  Because TRW's and Toyota's actions were willful and knowing, Plaintiffs' damages should be trebled.

287.     Plaintiffs further allege that TRW's and Toyota's malicious and deliberate conduct warrants an assessment of punitive damages because TRW and Toyota carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the South Carolina Consumer Sub-Class to cruel and unjust hardship as a result.  TRW's and Toyota's intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them, deceived Plaintiffs and the South Carolina Consumer Sub-Class on life-or-death matters, and concealed material facts that only TRW and Toyota knew, all to avoid the expense and public relations nightmare of correcting a deadly flaws in the Class Vehicles and/or the Defective ACUs installed in them.  TRW's and Toyota's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.  Plaintiffs further seek an order enjoining TRW's and Toyota's unfair or deceptive acts or practices.

## COUNT 11

**Violation of the South Carolina Regulation of Manufacturers,
Distributors, and Dealers Act
S.C. Code Ann. § 56-15-10, *et seq.***

288.     This claim is brought only on behalf of the South Carolina Consumer Sub-Class against TRW and Toyota.

289.     TRW and Toyota are "manufacturers" as set forth in S.C. Code Ann.§ 56-15-10, as TRW was engaged in the business of manufacturing ACU units, and Toyota was engaged in the business of manufacturing or assembling new and unused motor vehicles.

290.     TRW and Toyota committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30.

291.     TRW and Toyota engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs, the South Carolina Consumer Sub-Class, and to the public.

292.     TRW's and Toyota's bad faith and unconscionable actions include, but are not limited to: (1) representing that Class Vehicles and/or the Defective ACUs installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell or lease them as advertised; (4) representing that a transaction involving them confers or involves rights, remedies, and obligations which it does not; and/or (5) representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

293.     TRW and Toyota resorted to and used false and misleading advertisements in connection with TRW's and Toyota's businesses.  As alleged above, they made numerous material statements and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them that were either false or misleading.  Each of these statements and omissions contributed to the deceptive context of TRW's and Toyota's unlawful advertising and representations as a whole.

294.     Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiffs bring this action on behalf of themselves and the South Carolina Consumer Sub-Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

295.     Plaintiffs and the South Carolina Consumer Sub-Class are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110.  Plaintiffs also seek injunctive relief under S.C. Code Ann. § 56-15-110.  Plaintiffs also seek treble damages because TRW and Toyota acted maliciously.

## COUNT 12

### Breach of the Implied Warranty of Merchantability

### S.C. Code § 36-2-314.

296.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the South Carolina Consumer Sub-Class against TRW and Toyota.

297.   TRW and Toyota are and were at all relevant times merchants with respect to motor vehicles and/or ACUs within the meaning of S.C. Code Ann. § 36-2-314.

298.   A warranty that the Class Vehicles and/or the Defective ACUs installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to S.C. Code Ann. § 36-2-314.

299.   The Class Vehicles and/or the Defective ACUs installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and ACUs are used.  Specifically, they are inherently defective and dangerous in that the Defective ACUs may fail to deploy a vehicle's safety systems in the event of a collision.

300.   TRW and Toyota were provided notice of these issues by their knowledge of the ACU Defect, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after investigations were launched, recalls were issued, and the allegations of the ACU Defect became public.

301.   As a direct and proximate result of TRW's and Toyota's breach of the warranties of merchantability, Plaintiffs and the South Carolina Consumer Sub-Class have been damaged in an amount to be proven at trial.

## C.   Claims Brought on Behalf of the Virginia Consumer Sub Class

## COUNT 13

### Violation of the Virginia Consumer Protective Act

### Va. Code Ann. § 59.1-196, *et seq.*

302.   This claim is brought only on behalf of the Virginia Consumer Sub-Class against TRW and Toyota.

303.   TRW and Toyota are "suppliers" under Va. Code Ann. § 59.1-198.

304.   The sale of the Class Vehicles with the Defective ACUs installed in them to the Class members was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

305.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "5. Misrepresenting that good or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.  TRW and Toyota violated the Virginia CPA by misrepresenting that the Class Vehicles and/or the Defective ACUs installed in them had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that they were of a particular standard, quality, grade, style, or model when they were another; advertising them with intent not to sell or lease them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

306.   In the course of TRW's and Toyota's businesses, TRW and Toyota failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. TRW and Toyota also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment,

suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective ACUs installed in them.

307.    As alleged above, TRW knew or should have known of the ACU Defect no later than January 2016, through its design and development of the ACU, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself and the automakers, internal investigations into airbag non-deployment incidents, ACU and ASIC government investigations, and public recalls.

308.    As alleged above, Hyundai knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls. Toyota also knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls.  And Honda knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls.

309.    TRW and Toyota failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them.

310.    By failing to disclose and by actively concealing the ACU Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, TRW and Toyota engaged in unfair or deceptive business practices in violation of the Virginia CPA.  TRW and Toyota deliberately withheld the information about the propensity of the Defective ACUs to cause airbags to fail to deploy and

seatbelt pretensioners to fail to engage during collision events, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

311. In the course of TRW's and Toyota's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. TRW and Toyota compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective ACUs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

312. TRW's and Toyota's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective ACUs installed in them, the quality of TRW's and Toyota's brands, and the true value of the Class Vehicles.

313. TRW and Toyota intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective ACUs installed in them with an intent to mislead Plaintiffs and the Virginia Sub-Class.

314. TRW and Toyota knew or should have known that their conduct violated the Virginia CPA.

315. As alleged above, TRW and Toyota made material statements about the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them that were either false or misleading.  TRW's and Toyota's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the ACU Defect or their failure to reasonably investigate it.

316. To protect their profits and to avoid remediation costs and a public relations nightmare, TRW and Toyota concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them and their tragic consequences, and allowed unsuspecting

new and used car purchasers to continue to buy/lease the Class Vehicles and continue driving highly dangerous vehicles.

317.    TRW and Toyota owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them because TRW and Toyota:

        a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.      Intentionally concealed the foregoing from Plaintiffs; and/or

        c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

318.    Because TRW and Toyota fraudulently concealed the ACU Defect in Class Vehicles and/or the Defective ACUs installed in them, resulting in a raft of negative publicity once the ACU Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by TRW's and Toyota's conduct, they are now worth significantly less than they otherwise would be.

319.    TRW's and Toyota's failure to disclose and active concealment of the dangers and risks posed by the Defective ACUs in Class Vehicles were material to Plaintiffs and the Virginia Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

320.    Plaintiffs and the Virginia Sub-Class suffered ascertainable loss caused by TRW's and Toyota's misrepresentations and their failure to disclose material information.  Had they been aware of the ACU Defect that existed in the Class Vehicles and/or the Defective ACUs installed in them, and TRW's and Toyota's complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of TRW's and Toyota's misconduct.

321.     TRW's and Toyota's violations present a continuing risk to Plaintiffs, the Virginia Sub-Class, as well as to the general public.  TRW's and Toyota's unlawful acts and practices complained of herein affect the public interest.

322.     As a direct and proximate result of TRW's and Toyota's violations of the Virginia CPA, Plaintiffs and the Virginia Sub-Class have suffered injury-in-fact and/or actual damage.

323.     Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs and the Virginia Sub-Class seek monetary relief against TRW and Toyota measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Virginia Sub-Class member.  Because TRW and Toyota's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Virginia Sub-Class member, the greater of (a) three times actual damages or (b) $1,000.

324.     Plaintiffs also seek an order enjoining TRW's and Toyota's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq.*

## COUNT 14

### Breach of the Implied Warranty of Merchantability

### Va. Code Ann. § 8.2-314.

325.     In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Virginia Consumer Sub-Class against TRW and Toyota.

326.     TRW and Toyota are and were at all relevant times merchants with respect to motor vehicles and/or ACUs within the meaning of Va. Code Ann. § 8.2-314.

327.     A warranty that the Class Vehicles and/or the Defective ACUs installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Va. Code Ann. § 8.2-314.

328.   The Class Vehicles and/or the Defective ACUs installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective ACUs could fail during a crash event resulting in the non-deployment of airbags and seat belt pretensioners, thereby failing to protect drivers and passengers in collisions.

329.   TRW and Toyota were provided  notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after investigations were launched, recalls were issued, and the allegations of the ACU Defect became public.

330.   As a direct and proximate result of TRW's and Toyota's breach of the warranties of merchantability, Plaintiffs and the Virginia Sub-Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.   An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23.;

B.   A declaration that the ACUs in Class Vehicles are defective;

C.   An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

D.   An award to Plaintiffs and Class Members of compensatory, exemplary, and

punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E.     An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

F.     A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective ACUs in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the forthcoming recall of the vehicles and correction of the Defective ACUs;

G.     A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

H.     An award of attorneys' fees and costs, as allowed by law;

I.     An award of prejudgment and post judgment interest, as provided by law;

J.     Leave to amend this Complaint to conform to the evidence produced at trial; and

K.     Such other relief as may be appropriate under the circumstances.

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: April 30, 2019

**PODHURST ORSECK, P.A.**

 /s/ Peter Prieto
Peter Prieto (FBN 501492)
John Gravante  (FBN 617113)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
SunTrust International Center
One Southeast 3rd Ave, Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com
jgravante@podhurst.com
mweinshall@podhurst.com
adelriego@podhurst.com